IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Terrell J. Woodley,  )<br>  )<br>           Plaintiff,  )<br>  )<br>vs.  )<br>  )<br>Michael J. Astrue,  )<br>Commissioner of Social Security,  )<br>  )<br>           Defendant.  )<br>_____ ) | Civil Action No. 6:07-0985-SB-WMC<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security terminating his eligibility for supplemental security income benefits under Title XVI of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff, as a minor child, was awarded supplemental security income (SSI) benefits commencing January 1, 1993, due to attention deficit hyperactivity disorder, based upon an application filed January 14, 1993. The plaintiff attained age 18 on June 19, 1997, and the claim was reevaluated, at which time it was determined that the plaintiff's condition had improved and that he no longer had marked and/or severe functional

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

limitations. Disability was found to have ceased on August 1, 1997; therefore, the plaintiff's eligibility for SSI benefits terminated at the end of October 1997.

The plaintiff's mother requested reconsideration of the decision, which was denied on June 14, 1999. She then filed a timely request for a hearing. The hearing was held on February 10, 2000, attended by the plaintiff and his mother. Following the hearing, the administrative law judge (ALJ) found that the plaintiff was no longer under a disability, as he could perform medium work which did not involve continuous use of the left hand. The plaintiff requested review of the decision, and on December 6, 2001, the Appeals Council remanded the case to the ALJ for further consideration.

A supplemental hearing was held on March 13, 2002, at which the plaintiff, his attorney, his mother and a vocational expert appeared. On January 13, 2003, the ALJ again found that the plaintiff's disability had ceased on August 1, 1997. The ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on July 10, 2004. The plaintiff then sought judicial review.

On February 2, 2006, the Honorable Sol Blatt, Jr., Senior United States District Judge, adopted the recommendation of this court and remanded the case to the Commissioner for further proceedings. On January 24, 2007, a hearing was held at which the plaintiff, his attorney, his mother and a vocational expert appeared. On February 16, 2007, the ALJ once again found that the plaintiff was not under a disability. The ALJ's finding became the final decision of the Commissioner when it was subsequently approved by the Appeals Council.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1) The claimant has not engaged in substantial gainful activity since January 1, 1993, the alleged onset date (20 CFR 416.920(b) and 416.971 *et seq.*).

2

(2)     The claimant has the following severe impairments: borderline intellectual functioning, antisocial traits, loss of grip strength in the left hand due to flexion contracture, and chronic back pain (20 CFR 416.920(c)).

(3)     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

(4)     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work. He can lift up to 50 pounds occasionally and 25 pounds frequently. He reads at the fourth grade level and is illiterate. He has a Verbal IQ of 73, a Performance IQ of 73, and a Full Scale IQ of 72. He is right-handed. He has a flexion contracture problem with his left ring finger and is moderately limited in his left hand grip (with grip strength 3/5 on the left). He has antisocial personality traits resulting in moderate limitations in understanding, remembering, and carrying out detailed instructions and in maintaining concentration and attention for extended periods. He is limited to working in a relatively low stress setting where he would not have to deal with the general public or relate extensively with others.

(5)     The claimant has no past relevant work (20 CFR 416.965).

(6)     The claimant was born on June 19, 1979 and he is now 27 years of age, which is defined as a younger individual age 18044, on the date the application was filed (20 CFR 416.963).

(7)     The claimant is illiterate and is able to communicate in English (20 CFR § 416.964).

(8)     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

(9)     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

(10)    The claimant has not been under a disability, as defined in the Social Security Act, since January 14, 1993, the date the application was field (20 CFR 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability

to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there

is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was 27 years old on the date of the Commissioner's final decision (Tr. 65.)  He completed the ninth grade in special education classes and has no past relevant work experience (Tr. 41-42).

The record reveals that on August 12, 1997, Cashton B. Spivey, Ph.D., evaluated the plaintiff at the request of the Commissioner.  Dr. Spivey noted that the plaintiff had never been hospitalized for any physical or mental problem and had been taking Ritalin for ADHD, but that he had not taken Ritalin on the day of the evaluation.  The plaintiff denied symptoms of depression or psychosis, reported normal sleep and energy level, and complained of problems with attention/concentration.  He indicated he could read a newspaper and perform simple arithmetic calculations.  Dr. Spivey found the plaintiff had borderline intellectual functioning with a verbal IQ of 73, a performance IQ of 73, and a full scale IQ of 72.  He noted that the plaintiff displayed no weakness in immediate visual memory, which he found to be inconsistent with ADHD.  He found that the plaintiff read and performed arithmetic at a fifth-grade level.  Dr. Spivey concluded that the plaintiff was developing antisocial personality traits, would continue to benefit from special education classes, and would hopefully be able to be a successful member of the work force in the future.  Dr. Spivey also concluded that the plaintiff was better suited for manual labor than verbal or arithmetic tasks (Tr. 232-34).

On August 18, 1997, Dr. John Aycock examined the plaintiff at the request of the Commissioner.  Dr. Aycock found the plaintiff had a flexion-tendon injury of the ring finger of the left hand, which could be surgically corrected, and no other physical abnormalities (Tr. 215-18).

6

On August 21, 1997, at the request of the Commissioner, Dr. Herbert Gorod completed a Psychiatric Review Technique Form (PRTF) regarding the plaintiff based on a review of the plaintiff's records. Dr. Gorod reported that the plaintiff's borderline intellectual functioning and antisocial personality disorder caused "moderate" limitations in activities of daily living, social functioning, and concentration, and had "once or twice" resulted in episodes of decompensation in work-like settings (Tr. 219-27). In an accompanying mental residual functional capacity assessment, Dr. Gorod reported that the plaintiff had no significant limitations in most areas of work-related mental functioning, and "moderate" limitations in understanding, remembering, and carrying out detailed instructions, and accepting instructions and responding appropriately to criticism from supervisors (Tr. 228-30).

On February 25, 1999, Dr. James W. Folk, Jr., examined the plaintiff at the request of the Commissioner. The plaintiff complained of back pain resulting from an injury sustained in September 1998, when he was struck by a truck, and an inability to extend his left ring finger. He denied a history of psychiatric treatment, and, except for Motrin and occasional doses of Ritalin to help him calm down, he denied taking medication. He stated that he spent his time exercising, walking around, and playing basketball, and that he did some household chores and yard work. He reported that he had recently completed a GED program but had not yet taken the test due to lack of funds. The plaintiff's mother indicated that the plaintiff "[ran] with a bad crowd," engaged in various antisocial behaviors, and had difficulty with various tasks due to a failure to pay attention (Tr. 261-62).

Dr. Folk found the plaintiff had fair memory and limited general information; below-average counting, calculating and digit-recall abilities; absent insight; moderately-impaired judgment; and low-average intellectual functioning. He found the plaintiff capable of interacting socially, concentrating and understanding and responding appropriately, and he noted that the plaintiff denied many of the behaviors described by his mother. Dr. Folk

7

reported diagnoses of ADHD (by history), antisocial personality traits, and a GAF of 65.[2] Dr. Folk stated that although the plaintiff had a history of ADHD, "presently the concern would be more his personality deficits and the need for some structure in his life. " Dr. Folk concluded that the plaintiff "would be quite capable of doing some type of manual labor," and recommended referral to the Department of Vocational Rehabilitation (Tr. 263-64).

On March 16, 1999, at the request of the Commissioner, Lisa Smith-Klohn, Ph.D., completed a PRTF regarding the plaintiff based on a review of his records. Dr. Smith-Klohn reported that the plaintiff's ADHD, borderline intellectual functioning and antisocial personality disorder caused "moderate" limitations in activities of daily living and social functioning, "often" caused deficiencies of concentration and "never" resulted in episodes of deterioration or decompensation in work-like settings (Tr. 269-77). In an accompanying mental residual functional capacity assessment, Dr. Smith-Klohn reported that the plaintiff had no significant limitations in most areas of work-related mental functioning and moderate limitations in understanding, remembering and carrying out detailed instructions, and in maintaining concentration and attention for extended periods (Tr. 265-67).

On April 29, 1999, at the request of the Commissioner, Dr. Richard Weymuth assessed the plaintiff's physical residual functional capacity based on a review of the plaintiff's records. Dr. Weymuth concluded that the plaintiff did not have a "severe"[3] physical impairment (Tr. 279-87).

---

[2]A Global Assessment of Functioning (GAF) code between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 32 (4th ed. 1994).

[3]An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. *See* 20 C.F.R. § 416.921(a) (2007).

On December 20, 1999, an orthopedist at the Medical University of South Carolina found the plaintiff had decreased grip strength in the left hand and problems with flexion and contraction in the fingers of the left hand, particularly the ring finger, due to a previous injury (Tr. 254).

On March 14, 2000, Dr. Craig Harris examined the plaintiff in relation to complaints of injuries sustained in a motor vehicle accident on week earlier. The plaintiff complained of headaches, dizziness, insomnia, neck pain, upper back pain, midback pain, low-back pain, and left hand and wrist pain. Dr. Harris found the plaintiff had normal strength in the upper and lower extremities, decreased range of motion of the lumbar spine, muscle spasms in the cervical region and decreased grip strength in the left hand. He noted an assessment of cervicogenic cephalgia, cervical strain/sprain, thoracic strain/sprain, lumbar strain/sprain, and exacerbation of preexisting hand injury. Dr. Harris recommended medication for inflammation and pain (Tr. 342-44).

The plaintiff returned to Dr. Harris on an unspecified date, complaining of severe low-back and left-hand pain. His neurological examination was unremarkable. Dr. Harris recommended continued conservative treatment and an MRI scan (Tr. 344-45).

On October 14, 2001, the plaintiff presented at Care Alliance Health Services with complaints of headaches and of pain in the right knee and mid-back following a motor vehicle accident. An impression of contusion of the right knee and back strain was rendered (Tr. 348-54).

On January 10, 2002, the plaintiff returned to Care Alliance Health Services complaining of back pain since October 2001. The plaintiff related that he had taken no medication to attempt to relieve his pain, and his examination was unremarkable. He was diagnosed with chronic low-back pain (Tr. 357-63).

In June 2002, the plaintiff sought emergency room treatment for complaints of low-back pain. Examination revealed decreased range of motion and muscle spasms

in the lower back. Anaprox and Norflex were prescribed for chronic low-back pain (Tr. 497-502).

In October 2004, the plaintiff sought emergency room treatment for complaints of dizziness, headache and nausea. A CT scan of his head was normal. Compazine was administered and a diagnosis of acute cephalgia was noted (Tr. 468-75).

In November 2005, the plaintiff sought emergency room treatment for complaints of head and back pain after a fall. On admission, "Jim Grant Carpeting" was identified as his employer. A CT scan of the plaintiff's head was normal, and x-rays of his back showed a mild compression deformity at T7-8. Percocet was prescribed (Tr. 454-66).

In March 2006, the plaintiff sought emergency room treatment for complaints of intermittent headaches after he fell and hit his head several months before. On admission "Jim Grant Carpeting" was identified as the plaintiff's employer. Examination was unremarkable except for elevated blood pressure, and a CT scan of his brain was normal. He was diagnosed with chronic headache and hypertension. Lortab and antihypertensive medication were prescribed (Tr. 445-53).

At the hearing on February 10, 2000, the plaintiff testified that he left school in the tenth grade (Tr. 27.) He testified that he attempted to work as a dishwasher in a pizza shop and that the job ended after one day because his hand hurt (Tr. 28). He testified that his left hand was weak and that it sometimes started "jumping" for no apparent reason (Tr. 30). He testified that he experienced pain in his right leg when walking (Tr. 31). He testified that he could read "a little bit" and could write (Tr. 29).

At the hearing on March 13, 2002, the plaintiff testified that he had enrolled in a GED class but never completed it (Tr. 42-43). He testified that he was unable to grip anything with his left hand and that he experienced intermittent back pain, mostly at night (Tr. 43). He testified that he did "not really" know how to read (Tr. 44-45).

Hermina Woodley, the plaintiff's mother, testified that the plaintiff did not complete household chores he started, could not understand instructions and could not successfully buy items on a shopping list (Tr. 47-49). She testified that his only activities were watching television and listening to the radio (Tr. 47-48). She testified that he was impatient and quick to become angry (Tr. 50-52). She testified that he no longer took Ritalin and that aspirin was his only medication (Tr. 52).

The ALJ asked Mark Meadows, Ed.D., a vocational expert, to consider a person of the plaintiff's age and educational background who read at a fourth-grade level, was illiterate "in terms of Social Security rules," could perform "medium work," and had a full scale IQ of 72, a flexion-contraction problem with his left ring finger, and moderately limited grip strength in his left hand (Tr. 53-54). Dr. Meadows testified that such a person could work as a flag man/signaler, inspector/grader/sorter, and cleaner/housekeeper (Tr. 55-56). He also testified that if the same individual were restricted to low-stress work, he could perform those jobs (Tr. 57-58).

At the hearing on January 24, 2007, the plaintiff did not testify (Tr. 503-22). Ms. Woodley testified that the plaintiff's back bothered him all the time since he was hit by a truck in 2002, and that he had headaches associated with high blood pressure, for which he took medication (Tr. 507). She testified that he continued to have problems controlling his anger and was forgetful, but that his control of his anger had improved (Tr. 508-09). She testified that he could not finish tasks without being reminded (Tr. 509-10). She testified that the plaintiff pushed her around in her wheelchair, gave her medications, watched television, spent time with her granddaughter, and did housework if he was constantly told what to do (Tr. 510-12). She testified that the plaintiff's current main problem was back pain (Tr. 513).

At this hearing, the ALJ asked Arthur F. Schmitt, Ph.D., a vocational expert, to consider a person with the following limitations:

11

> Assume I find the claimant is 27-years of age and has an 8th grade education in special education and is illiterate by Social Security standards. Assume further for the moment that on an exertional level he could perform no greater than medium work activity and that he has the following nonexertional limitations. He's, he reads at the 4th grade level and is illiterate by our standards, he has a verbal IQ of 73, a performance IQ of 73, and a full scale IQ of 72. He's right-handed, he has a flexion contracture problem with his left wring finger and is moderately limited in his left hand grip.. The grip strength in his left hand is three out of five. In addition he has a antisocial personality resulting in moderate limitations in understanding, remembering and carrying out detailed instructions and in maintaining concentration and . . . attention . . . for extended periods. He's limited to working at a relatively low-stress setting where he wouldn't have to deal with the general public or relate extensively with others ...

(Tr. 513-14). Dr. Schmitt testified that such a person could perform unskilled medium work as a laundry worker, and unskilled light work as a carton packer (Tr. 514-15). He testified that a person with the limitations stated in the ALJ's hypothetical would be limited to jobs requiring level-one reasoning, and that the jobs of laundry worker and carton packer were described in the *DOT* as requiring level-two reasoning (Tr. 515-21). Dr. Schmitt acknowledged that a conflict existed between his testimony and those jobs with regard to reasoning-level requirements, but that based on his experience, all carton packer jobs and 30 percent of laundry worker jobs required only level-one reasoning (Tr. 518-22).

## **ANALYSIS**

As noted above, on February 2, 2006, the Honorable Sol Blatt, Jr., Senior United States District Judge, adopted the recommendation of this court and remanded the case to the Commissioner for further proceedings. Upon remand, the ALJ was directed to conduct a supplemental hearing and: (1) include in the hypothetical to the vocational expert the plaintiff's antisocial personality traits and his moderate limitations in understanding, remembering, and carrying out detailed instructions and in maintaining concentration and

attention for extended periods; (2) obtain testimony from a vocational expert to explain why the plaintiff would be able to perform the positions listed by the vocational expert in the 2002 hearing, which required a reasoning level of R-2 or above, when the ALJ had found that the plaintiff was illiterate and capable of only one- and two-step processes, which under the criteria of the *DOT* constitutes an R-1 reasoning level; and (3) consider and expressly evaluate the testimony of the plaintiff's mother and set forth the reasons for not crediting her testimony. On January 24, 2007, a hearing was held at which the plaintiff, his attorney, his mother, and a vocational expert appeared. On February 16, 2007, the ALJ once again found that the plaintiff was not under a disability.

The plaintiff argues that the ALJ erred by (1) failing to obtain vocational expert testimony as ordered by remand; (2) failing to properly evaluate and consider lay testimony as ordered by remand; and (3) failing to consider whether his combined impairments were of equal medical significance to a listed impairment.

***Vocational Expert Testimony***

In the report and recommendation adopted by Judge Blatt, this court explained that the plaintiff's mental limitations were consistent with the *DOT*'s criteria for level-one reasoning ("R1"), that the jobs the vocational expert identified at the March 2002 hearing (flag man/signaler, inspector/grader/sorter, and cleaner/housekeeper) required level-two reasoning ("R2) or higher, and that the ALJ erred by failing to resolve this apparent conflict between the vocational expert's testimony and the *DOT* (Tr. 429-30).

An ALJ is not restricted to the *DOT* in determining whether work exists in the national economy that a claimant can perform; the ALJ may also rely on vocational-expert testimony to make that determination. *See* 20 C.F.R. § 416.966(d), (e) (2007).

In his initial brief, the plaintiff argued that the ALJ failed to obtain testimony to explain the conflict between the vocational expert's testimony and the *DOT* as required

in the remand order. In his reply brief, the plaintiff conceded that the ALJ did obtain the required testimony. However, the plaintiff argues that the vocational expert testimony obtained by the ALJ shows that he is indeed disabled. As this issue was not raised in the plaintiff's initial brief, the defendant was given an opportunity to respond, which he did on March 20, 2008.

In his hypothetical to the vocational expert in the latest hearing, the ALJ included the following limitation: "Antisocial personality resulting in moderate limitations in understanding, remembering, and carrying out detailed instructions, and in maintaining concentration for extended periods" (Tr. 513-14). In response to the hypothetical, the vocational expert identified the jobs of laundry worker and carton packer as jobs such a person could perform (Tr. 514-15). The plaintiff's attorney asked the expert to define "moderate limitation," since the plaintiff had a "moderation limitation in understanding, remembering, and carrying out detailed instructions" (Tr. 517). The vocational expert testified that a "moderate" impairment was one that was present more than 50% of the time (Tr. 517). The attorney then asked whether a person who was unable to concentrate, remember and carry out instructions for more than 50% of the time could do the work identified by the vocational expert (laundry worker and carton packer) (Tr. 518). In response, the vocational expert testified: "[I]f he cannot concentrate . . . more than 50 percent, moderate limitation, I would eliminate the job." The attorney then asked, "Would that eliminate pretty much all jobs?," to which the vocational expert replied, "Yeah" (Tr. 518).

The defendant argues that this apparent inconsistency in the vocational expert's testimony was clarified in the vocational expert's later testimony under questioning by the ALJ. The vocational expert testified that the ALJ's hypothetical described an individual with level-one reasoning skills, and that the jobs he identified in response to the hypothetical were described in the *DOT* as requiring level-two reasoning (Tr. 520). The ALJ asked the vocational expert to explain this conflict between his testimony and the *DOT* (Tr.

520). In response, the vocational expert testified that, based on his personal observations, the job of carton packer and 30 percent of laundry-worker jobs required only R1 reasoning ability (Tr. 520-22). After the plaintiff's counsel finished questioning the vocational expert, the ALJ asked the expert to consider the "original limitations I gave you," including moderate limitations in maintaining concentration and attention (Tr. 521). The vocational expert testified that a person with moderate limitations in maintaining concentration and attention and with the plaintiff's other limitations could perform the job of carton packager without a reduction in the number of jobs and could perform the job of laundry worker with a 70% reduction in the number of jobs (Tr. 521-22). Earlier, the vocational expert had testified that 235,708 laundry worker jobs and 275,000 carton packer jobs existed in the national economy (Tr. 514-15). Thus, even with a 70% reduction in the number of laundry-worker jobs, the vocational expert indicated that the plaintiff could perform 345,712 jobs (70,712 laundry worker jobs plus 275,000 carton packager jobs) in the national economy. Therefore, the defendant contends that the vocational expert provided evidence of a significant number of jobs that the plaintiff could perform. *See Martinez v. Heckler*, 807 F.2d 771 (9th Cir. 1986) (finding 3,750 to 4,250 jobs a significant number); *Allen v. Bowen*, 816 F.2d 600 (11th Cir. 1987) (finding 80,000 in the nation a significant number; *Barker v. Sec'y of Health & Human Servs.*, 882 F.2d 1474 (9th Cir. 1989) (finding 1,900 jobs a significant number).

      The vocational expert's testimony at the January 2007 hearing was, as conceded by the defendant, quite confusing. However, the vocational expert clarified his testimony and stated that based upon his own observations the jobs of carton packer and 30 percent of laundry-worker jobs required only R1 reasoning ability, and he further testified that a person with moderate limitations in maintaining concentration and attention, like the plaintiff, could perform those jobs (Tr. 521). Considering the entire record, this court finds

that the Commissioner has met the burden of showing that the plaintiff can perform alternative work and that such work exists in the national economy.

***Witness Testimony***

The plaintiff next argues that the ALJ failed to properly evaluate and consider the testimony of the plaintiff's mother. Specifically, the plaintiff complains that the ALJ addressed only the witness' testimony regarding the plaintiff's physical impairments and ignored her testimony as to the plaintiff's mental impairments, including a longstanding history of violent and impulsive behavior and difficulty understanding instructions and paying attention (Tr. 508-10).

Upon remand, the ALJ was instructed to "consider and expressly evaluate the testimony of the plaintiff's witness, his mother, and set forth the reasons for not crediting her testimony." At the hearing on January 24, 2007, the plaintiff's attorney asked the plaintiff's mother whether the plaintiff still had difficulty in controlling his anger. She replied that it was not as bad as it used to be (Tr. 508). The plaintiff's mother testified that the plaintiff was about the same as he had been 2002 with regard to his memory, paying attention, understanding instructions, and controlling impulses (Tr. 509-10). The plaintiff's mother testified that she had to constantly tell the plaintiff what to do (Tr. 510).

In his decision, the ALJ recounted this testimony about the plaintiff's mental impairments, as well as the testimony of the plaintiff's mother from the 2002 hearing (Tr. 388-89). Later in the decision, he recounted the plaintiff's testimony and his mother's testimony as to his back pain. He then cited medical evidence showing that the plaintiff had no significant back abnormalities and stated: "For the reasons stated, I do not find his testimony and the testimony of the claimant's mother fully credible" (Tr. 390).

The ALJ found that the plaintiff was mildly limited in activities of daily living and moderately limited in maintaining social functioning and in concentration, persistence,

and pace (Tr. 387). In making these findings, the ALJ stated: "The claimant's mother testified that the claimant does some housework, helps her with medications and pushes her around, likes to visit his aunt, and he watches television. After considering his daily activities, I find that he has only a mild limitation in daily activities" (Tr. 387). With regard to his finding about social functioning, the ALJ noted that there was evidence that the plaintiff exhibited antisocial traits, and therefore he found the plaintiff moderately limited in that area (Tr. 387). As to concentration, persistence, and pace, the ALJ noted the plaintiff's IQ scores were in the 70s but that Dr. Spivey had reported the plaintiff was capable of successfully joining the workforce. Accordingly, he found the plaintiff moderately limited in that area (Tr. 387). Although the ALJ did not state whether he considered the plaintiff's mother's testimony in making these findings, it appears to this court that her testimony as to the plaintiff's social functioning and concentration actually supports these findings.

### *Combined Impairments*

Lastly, the plaintiff argues that the ALJ failed to consider whether his combined impairments were of equal medical significance to a listed impairment. In a disability case, the combined effect of all the claimant's impairments must be considered without regard to whether any such impairment if considered separately would be sufficiently disabling. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's 'ability to engage in substantial gainful activity.'" *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect of the various impairments on the claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

The defendant first argues that the plaintiff has not met his burden of proving that his impairments meet or equal a listing. The plaintiff has failed to explain how his condition satisfies the criteria of a specific listing, and he has failed to identify any listing his conditions might equal. Furthermore, the defendant argues that the ALJ considered the effects of all of the plaintiff's impairments in determining his residual functional capacity. The ALJ accounted for the plaintiff's low-back pain by limiting him to medium work (Tr. 387). He found the plaintiff's "flexion contracture problem" with his left ring finger reduced his grip strength in the left hand (Tr. 387). He accommodated the plaintiff's borderline intelligence and antisocial personality traits by limiting him to low-stress work that did not require contact with the general public or extensive contact with others, and that a person with moderate limitations in maintaining concentration and attention and moderate limitations in understanding, remembering and carrying out detailed instructions could perform (Tr. 387). This court has reviewed the record and finds that the ALJ properly considered the combined effect of the plaintiff's impairments.

## **CONCLUSION AND RECOMMENDATION**

This court has considered the entire record and finds that the ALJ's decision that the plaintiff is not disabled is based upon substantial evidence. Based upon the foregoing, this court recommends the decision of the Commissioner be affirmed.

s/William M. Catoe
United States Magistrate Judge

April 2, 2008

Greenville, South Carolina