IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

RECEIVED
CLERK, CHARLESTON, SC

2008 JUL 25  A

| | |
|---|---|
| Terrell J. Woodley, ) | |
| ) | Civil Action No. 6:07-0985-SB |
| Plaintiff, ) | |
| ) | |
| -vs- ) | **ORDER** |
| ) | |
| Michael J. Astrue, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| —————————————————) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act,

codified at 42 U.S.C. § 405(g), to obtain judicial review of the Commissioner of Social

Security's ("Commissioner") final decision, which denied Terrell J. Woodley's claim for

Supplemental Security Income ("SSI") benefits.   The record includes a Report and

Recommendation ("R&R") of a United States Magistrate Judge, made in accordance with

28 U.S.C. § 636(b)(1)(B) and Local Rule 73.02(B)(2)(a).  In the R&R, Magistrate Judge

William M. Catoe recommends that the Court affirm the Commissioner's final decision.

The Plaintiff filed timely objections to the R&R, and the Defendant filed a response to the

Plaintiff's objections.  See 28 U.S.C. § 636(b)(1) (providing that a party may object, in

writing, to a Magistrate Judge's R&R within ten days after being served with a copy).



## BACKGROUND

**I.     Procedural History**

The Plaintiff was born on June 19, 1979.  On January 14, 1993, he filed for SSI

benefits due to attention deficit hyperactivity disorder ("ADHD") and was awarded these

benefits beginning on January 1, 1993.  The Plaintiff completed the ninth grade and has

no past relevant work experience.

When the Plaintiff turned eighteen years old on June 19, 1997, his claim was reevaluated, and it was determined that his condition had improved and that he no longer had marked and/or severe functional limitations. Disability was determined to have ceased on August 1, 1997, and eligibility for benefits was terminated at the end of October of 1997.

The Plaintiff's mother filed a motion for reconsideration, which was denied by a disability hearing officer on June 14, 1999. The Plaintiff's mother then filed a timely request for a hearing, and on February 10, 2000, a hearing was held before Administrative Law Judge ("ALJ") J. L. Barroll. The Plaintiff and his mother attended the hearing. Following the hearing, ALJ Barroll issued a denial decision, finding that the Plaintiff could perform medium work that did not involve continuous use of the left hand. The Plaintiff requested review of the decision, and on December 6, 2001, the Appeals Council remanded the case to the ALJ for further consideration.

On March 13, 2002, ALJ R. Alexander Hild held a supplemental hearing, at which the Plaintiff, his attorney, his mother, and a Vocational Expert ("VE") appeared. On January 13, 2003, ALJ Hild, like ALJ Barroll, found that the Plaintiff's disability had ceased on August 1, 1997. ALJ Hild's finding became the final decision of the Commissioner of Social Security when the Appeals Council approved it on July 10, 2004.

Thereafter, the Plaintiff filed suit in the district court seeking judicial review of the Commissioner's final decision. On January 9, 2006, Magistrate Judge Catoe issued an R&R recommending that the Court reverse the Commissioner's final decision under sentence four of 42 U.S.C. § 405(g) and remand the matter for further consideration. Because neither party filed objections to the R&R, the Court adopted the R&R as the order

2

of the Court on February 2, 2006.

Following remand, ALJ Hild held another hearing on January 24, 2007, at which the Plaintiff's mother, his attorney, and VE Arthur F. Schmitt, Ph.D. appeared.[1]  On February 16, 2007, ALJ Hild again found that the Plaintiff was not under a disability.  The ALJ's decision became the final decision of the Commissioner when the Appeals Council approved it.  The Commissioner adopted the following findings of the ALJ:

(1)    The claimant has not engaged in substantial gainful activity since January 1, 1993, the alleged onset date (20 CFR 416.920(b) and 416.971 *et seq.*).

(2)    The claimant has the following severe impairments: borderline intellectual functioning, antisocial traits, loss of grip strength in the left hand due to flexion contracture, and chronic back pain (20 CFR 416.920(c)).

(3)    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

(4)    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work.  He can lift up to 50 pounds occasionally and 25 pound frequently.  He reads at the fourth grade level and is illiterate.  He has a Verbal IQ of 73, a Performance IQ of 73, and a Full Scale IQ of 72.  He is right-handed.  He has a flexion contracture problem with his left ring finger and is moderately limited in his left hand grip (with grip strength 3/5 on the left).  He has antisocial personality traits resulting in moderate limitations in understanding, remembering, and carrying out detailed instructions and in maintaining concentration and attention for extended periods.  He is limited to working in a relatively low stress setting where he would not have to deal with the general public or relate extensively with others.

_____

[1]  There is some discrepancy over whether the Plaintiff appeared at this hearing.  According to ALJ Hild's denial decision, the Plaintiff was not present at this hearing, but according to the 2008 R&R, the Plaintiff was present at the hearing.

(5)     The claimant has no past relevant work (20 CFR 416.965).

(6)     The claimant was born on June 19, 1979 and he is now 27 years of age, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963).

(7)     The claimant is illiterate and is able to communicate in English (20 CFR 416.964).

(8)     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

(9)     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

(Tr. at 386-91.)

On April 11, 2007, the Plaintiff filed the present suit in this Court, seeking review of the Commissioner's final decision and asserting that the ALJ: (1) did not obtain VE testimony as ordered by prior remand; (2) failed to properly evaluate and consider lay testimony as ordered by prior remand; and (3) failed to consider whether the Plaintiff's combined impairments were of equal medical significance to a listed impairment.

## II.    Medical Evidence

The Plaintiff was 27 years old on the date of the Commissioner's final decision. He completed the eighth or ninth grade in special education classes and has no past relevant work experience.

According to the record, on August 12, 1997, Cashton B. Spivey, Ph.D evaluated the Plaintiff at the request of the Commissioner. Dr. Spivey noted that the Plaintiff had never been hospitalized for any physical or mental problem and had been taking Ritalin for ADHD, although he had not taken Ritalin on the day of the evaluation. The Plaintiff

4

complained of problems with attention and concentration, denied symptoms of depression or psychosis, and reported normal sleep and energy levels. The Plaintiff also claimed that he could read a newspaper and perform simple arithmetic calculations. Dr. Spivey found that the Plaintiff read and performed arithmetic at a fifth-grade level; he also found that the Plaintiff had borderline intellectual functioning with a verbal IQ of 73, a performance IQ of 73, and a full scale IQ of 72. Dr. Spivey noted that the Plaintiff displayed no weakness in immediate visual memory, which Dr. Spivey found to be inconsistent with ADHD. Dr. Spivey concluded that the Plaintiff was developing antisocial personality traits, would continue to benefit from special education classes, and hopefully would be able to join the work force in the future. Dr. Spivey also concluded that the Plaintiff was better suited for manual labor tasks than verbal or arithmetic tasks.

On August 18, 1997, Dr. John Aycock examined the Plaintiff at the request of the Commissioner. Dr. Aycock found that the Plaintiff had a flexion-tendon injury of the ring finger of the left hand, which could be corrected surgically, and no other physical abnormalities.

On August 21, 1997, at the request of the Commissioner, Dr. Herbert Gorod completed a Psychiatric Review Technique Form regarding the Plaintiff based on a review of the Plaintiff's records. Dr. Gorod found that the Plaintiff's borderline intellectual functioning and antisocial personality disorder caused "moderate" limitations in activities of daily living, social functioning, and concentration, and had "once or twice" resulted in episodes of decompensation in work-like settings. In an accompanying mental residual functional capacity assessment, Dr. Gorod reported that the Plaintiff had no significant limitations in most areas of work-related mental functioning and "moderate" limitations in

5

understanding, remembering, carrying out detailed instructions, accepting instructions, and responding appropriately to criticism from supervisors.

On February 25, 1999, Dr. James W. Folk, Jr. examined the Plaintiff at the request of the Commissioner. The Plaintiff complained of two physical ailments: (1) back pain resulting from an injury received in September 1998, when a truck struck him, and (2) an inability to extend his left ring finger. The Plaintiff denied receiving any psychiatric treatment; he also denied taking any medication except for occasional doses of Motrin and Ritalin to calm him. He claimed that he occupied his time by exercising, walking around, playing basketball, and doing some occasional chores and yard work. The Plaintiff reported that he recently completed a GED program but had not yet taken the test due to lack of funds. The Plaintiff's mother indicated that he "[ran] with a bad crowd," engaged in various antisocial behaviors, and had difficulty with various tasks due to a failure to pay attention.

Dr. Folk concluded that the Plaintiff had fair memory and limited general information; below-average counting, calculating, and digit-recall abilities; absent insight; moderately-impaired judgment; and low-average intellectual functioning. Dr. Folk determined that the Plaintiff was capable of interacting socially as well as concentrating, understanding, and responding appropriately. Additionally, Dr. Folk noted that the Plaintiff denied many of the behaviors described by his mother. Dr. Folk reported the previous diagnoses of ADHD, antisocial personality traits, and a GAF of 65.[2] Noting the Plaintiff's history of ADHD and

---

[2] A Global Assessment of Functioning ("GAF") code between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal

the concern regarding the Plaintiff's personality deficits and "his need for some structure in his life," Dr. Folk determined that the Plaintiff "would be quite capable of doing some type of manual labor." Thus, Dr. Folk recommended referral to the Department fo Vocational Rehabilitation.

On March 16, 1999, at the request of the Commissioner, Lisa Smith-Klohn, Ph.D., completed a PRTF regarding the Plaintiff based on a review of his records. Dr. Smith-Klohn reported that the Plaintiff's ADHD, borderline intellectual functioning, and antisocial personality disorder caused "moderate" limitations in activities of daily living and social functioning, "often" caused deficiencies of concentration, and "never" resulted in episodes of deterioration or decompensation in work-like settings. In an accompanying mental residual functional capacity assessment, Dr. Smith-Klohn reported that the Plaintiff had no significant limitations in most areas of work-related mental functioning and moderate limitations in understanding, remembering, and carrying out detailed instructions, and in maintaining concentration and attention for extended periods.

On April 29, 1999, also at the request of the Commissioner, Dr. Richard Weymuth assessed the Plaintiff's physical residual functional capacity based on a review of his records. Dr. Weymuth determined that the Plaintiff did not have a "severe"[3] physical impairment.

On December 20, 1999, an orthopedist at the Medical University of South Carolina

relationships." American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 32 (4th ed. 1994).

[3] An impairment is "severe" if it significantly limits a claimants physical or mental ability to do basic work activities. <u>See</u> C.F.R. § 416.921(a) (2007).

7

found that the Plaintiff had decreased grip strength in the left hand and problems with flexion and contraction in the fingers of the left hand, particularly the ring finger, due to a previous injury.

On March 14, 2000, Dr. Craig Harris examined the Plaintiff due to complaints of injuries sustained in a motor vehicle accident that had occurred a week earlier.  The Plaintiff complained of headaches, dizziness, insomnia, neck pain, upper back pain, mid-back pain, low-back pain, and left hand and wrist pain.  Dr. Harris found that the Plaintiff had normal strength in the upper and lower extremities, decreased range of motion of the lumbar spine, muscle spasms in the cervical region, and decreased grip strength in the left hand.  He noted an assessment of cervicogenic cephalgia, cervical strain/sprain, thoracic strain/sprain, lumbar strain/sprain, and exacerbation of preexisting hand injury.  Dr. Harris recommended medication for inflamation and pain.  On a later visit to Dr. Harris, Woodley complained of severe low-back and left hand pain; however, his neurological exam was unremarkable, and Dr. Harris recommended continued conservative treatment and an MRI scan.

On October 14, 2001, the Plaintiff went to Care Alliance Health Services complaining of headaches, pain in the right knee, and mid-back pain following a motor vehicle accident.  An impression of contusion of the right knee and back strain was rendered.

On January 10, 2002, the Plaintiff again visited Care Alliance Health Services complaining of back pain since October 2001.  The Plaintiff reported that he had not taken any medication to attempt to relieve his pain, and his examination was unremarkable.  He was diagnosed with chronic low-back pain.

8

In June of 2002, the Plaintiff sought emergency room treatment for complaints of low-back pain. Examination revealed decreased range of motion and muscle spasms in the lower back. Anaprox and Norflex were prescribed for chronic low-back pain.

In October of 2004, the Plaintiff sought emergency room treatment for complaints of dizziness, headache, and nausea. A CT scan of his head was normal. Compazine was administered and a diagnosis of acute cephalgia was noted.

In November of 2005, the Plaintiff sought emergency room treatment for complaints of head and back pain after a fall. On admission, "Jim Grant Carpeting" was identified as his employer. A CT scan of the Plaintiff's head was normal, and x-rays of his back showed a mild compression deformity at T7-8. Percocet was prescribed.

In March of 2006, the Plaintiff sought emergency room treatment for complaints of intermittent headaches after he fell and hit his head several months before. On admission, "Jim Grant Carpeting" was identified as Woodley's employer. Examination was unremarkable except for elevated blood pressure. A CT scan of his brain was normal. He was diagnosed with chronic headaches and hypertension. Lortab or antihypertensive medication were prescribed.

## III.    Administrative Hearings

At the hearing on February 10, 2000, the Plaintiff testified that he left school in the tenth grade and attempted to work at a pizza shop as a dishwasher, but the job ended after one day because his hand hurt. The Plaintiff testified that his left hand was weak and started "jumping" for no reason. He further testified that he experienced pain in his right leg while walking. The Plaintiff also testified that he could read "a little bit" and could write.

At the March 13, 2002 hearing, the Plaintiff testified that he enrolled in a GED class

but never completed it.  He testified that he was unable to grip anything with his left hand and that he experienced intermittent back pain, mostly at night.  He further testified that he did "not really" know how to read.

Also, the Plaintiff's mother testified that the Plaintiff did not complete household chores that he started, could not understand cooking instructions, and could not successfully buy items on a shopping list.  She testified that his only activities were watching television and listening to the radio.  Additionally, she testified that he was impatient and quick to become angry, and that aspirin was his only medication because he no longer took Ritalin.

Also at the March 13, 2002 hearing, the ALJ asked Vocational Expert Mark Meadows, Ed.D. to consider a person of the Plaintiff's age and educational background who read at a fourth-grade level, was illiterate "in terms of Social Security rules," could perform "medium work," had a full scale IQ of 72, had a flexion-contraction problem with his left ring finger, and had a moderate limited grip strength in his left hand.  In response, Dr. Meadows testified that such a person could work as a flag man/signaler, inspector/grader/sorter, and cleaner/housekeeper.  He also testified that if the same individual were restricted to low-stress work, he could perform those jobs.

Following the first remand, at the January 24, 2007 hearing, the Plaintiff did not testify but his mother did.  The Plaintiff's mother testified that the Plaintiff's back constantly bothered him since he was hit by a truck when he was seventeen years old.[4]  Additionally,

---

[4] It is not entirely clear from the record when the Plaintiff was hit by the truck.  The R&R states that the Plaintiff was struck in 2002, at which time the Plaintiff would have been twenty-two or twenty-three years old.  However, the Plaintiff's mother testified that the Plaintiff was struck when he was seventeen years old.  Finally, Dr. Folk noted that the

she testified that he had headaches associated with high blood pressure, for which he took medication. She further testified that he continued to have problems controlling his anger, but that his control of his anger had improved. She testified that he was forgetful and needed to be reminded to finish tasks. Also, she testified that the Plaintiff pushed her around in her wheelchair, gave her medications, watched television (mainly cartoons), spent time with her granddaughter, and performed housework if she constantly told him what to do. Finally, she testified that the Plaintiff's current main problem was back pain.

Also at the January 24, 2007 hearing, the ALJ asked Vocational Expert Arthur F. Schmitt, Ph.D., to consider a person with the following limitations:

> Assume I find the claimant is 27-years of age and has an 8th grade education in special education and is illiterate by Social Security standards. Assume further for the moment that on an exertional level he could perform no greater then [sic] medium work activity and that he has the following non-exertional limitations. He's, he reads at the 4th grade level and is illiterate by our standards, he has a verbal IQ of 73, a performance IQ of 73 and a full scale IQ of 72. He's right-handed, he has a flexion contracture problem with his left ring finger and is moderately limited in his left hand grip. The grip strength in his left hand is three out of five. In addition he has a [sic] antisocial personality resulting in moderate limitations in understanding, remembering and carrying out detailed instructions and in maintaining concentration and . . . attention . . . for extended periods. He's limited to working at a relatively low-stress setting where he couldn't have to deal with the general public or relate extensively with others.

(Tr. 513-14.) Considering these limitations, Dr. Schmitt testified that such a person could perform unskilled medium work as a laundry worker and unskilled light work as a carton packer. Dr. Schmitt acknowledged that a person with the limitations described in the ALJ's hypothetical would be limited to jobs requiring level-one reasoning, but that the jobs of

---

Plaintiff complained of back pain resulting from being struck by a truck in September 1998, at which time the Plaintiff was nineteen years old.

11

laundry worker and carton packer were described in the <u>Dictionary of Occupational Titles</u> ("<u>DOT</u>") as requiring level-two reasoning. In recognizing this apparent conflict, Dr. Schmitt testified that based on his experience, all carton packer jobs and 30 percent of laundry worker jobs required only level one reasoning.

## STANDARD OF REVIEW

### I.     The Magistrate Judge's R&R

The Magistrate Judge makes only a recommendation to the Court. The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the Court. <u>Matthews v. Weber</u>, 423 U.S. 261, 269 (1976). The Court reviews *de novo* those portions of the R&R to which specific objection is made, and the Court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

### II.     Judicial Review of a Final Decision

The role of the federal judiciary in the administrative scheme as established by the Social Security Act is a limited one. Section 205(g) of the Act provides that, "[t]he findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). "Consequently, judicial review . . . of a final decision regarding disability benefits is limited to determining whether the findings are supported by substantial evidence and whether the correct law was applied." <u>Walls v. Barnhart</u>, 296 F.3d 287, 290 (4th Cir. 2002). "Substantial evidence" is defined as:

evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence

12

but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368

F.2d 640, 642 (4th Cir. 1966)). In assessing whether there is substantial evidence, the

reviewing court should not "undertake to reweigh conflicting evidence, make credibility

determinations, or substitute [its] judgment for that of" the agency. Mastro v. Apfel, 270

F.3d 171, 176 (4th Cir. 2001) (alteration in original).

## DISCUSSION

**I.    The Commissioner's Final Decision**

The Commissioner is charged with determining the existence of a disability. The

Social Security Act, 42 U.S.C. §§ 301-1399, defines "disability" as the "inability to engage

in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. §

423(d)(1)(A). This determination involves the following five-step inquiry:

> [The first step is] whether the claimant engaged in substantial gainful
> employment. 20 C.F.R. § 404.1520(b). If not, the anaylsis continues to
> determine whether, based upon the medical evidence, the claimant has a
> severe impairment. 20 C.F.R § 404.1520(c). If the claimed impairment is
> sufficiently severe, the third step considers whether the claimant has an
> impairment that equals or exceeds in severity one or more of the
> impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d);
> 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not,
> the next inquiry considers if the impairment prevents the claimant from
> returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a).
> If the answer is in the affirmative, the final consideration looks to whether the
> impairment precludes the claimant from performing other work.

Mastro, 270 F.3d at 177 (citing 20 C.F.R. § 416.920).

If the claimant fails to establish any of the first four steps, review does not proceed to the next step.  Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993).  The burden of production and proof remains with the claimant through the fourth step.  However, if the claimant successfully reaches step five, then the burden shifts to the Commissioner to provide evidence of a significant number of jobs in the national economy that the claimant could perform, considering the claimant's medical condition, functional limitations, age, education, and work experience.  Walls, 296 F.3d at 290.

Here, the ALJ determined that the Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability, January 1, 1993.  At the second step, the ALJ found that the Plaintiff established that he had "severe" impairments (listed as borderline intellectual functioning, antisocial traits, loss of grip strength in the left hand due to flexion contracture, and chronic back pain).  Third, the ALJ found that these medically determinable impairments did not meet or medically equal any of the criteria listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926).  The ALJ then determined that the Plaintiff's allegations and testimony regarding his limitations were not totally credible and found that the Plaintiff retained the residual functional capacity ("RFC") to perform medium work with the limitation of "working in a relatively low stress setting where he would not have to deal with the general public or relate extensively with others."  Because the ALJ found that the Plaintiff had no past relevant work, the analysis proceeded to step five.  At step five, the ALJ accepted the VE's testimony that a person of the Plaintiff's age with his educational background and RFC could successfully adjust to other work, and that such jobs exist in significant numbers in the national economy.  Therefore, the ALJ found that the Plaintiff was not under a

14

"disability" as defined in the Social Security Act.

## II.    The Court's Analysis

As previously noted, on February 2, 2006, this Court adopted the Magistrate Judge's previous R&R and remanded this matter to the Commissioner to conduct a supplemental hearing.  The Court directed the ALJ to: (1) include in the hypothetical to the VE the Plaintiff's antisocial personality traits and his moderate limitations in understanding, remembering, and carrying detailed instructions and in maintaining concentration for extended periods; (2) obtain testimony from a VE to explain why the Plaintiff would be able to perform the positions listed by the VE in the 2002 hearing, which required a reasoning level of R-2 or above, when the ALJ had found that the Plaintiff was illiterate and capable of only one- and two- step processes, which under the criteria of the DOT constitutes an R-1 reasoning level; and (3) consider and expressly evaluate the testimony of the Plaintiff's mother and set forth the reasons for not crediting her testimony.  On January 24, 2007, a hearing was held at which the Plaintiff, his attorney, his mother, and a VE appeared.  On February 16, 2007, the ALJ once again determined that the Plaintiff was not disabled.

In his complaint, the Plaintiff alleges that the ALJ erred when he: (1) did not obtain VE testimony as ordered by prior remand; (2) failed to properly evaluate and consider his mother's testimony as ordered by prior remand; and (3) failed to consider whether the Plaintiff's combined impairments were of equal medical significance to a listed impairment.

After a review of the record, the Magistrate Judge issued an R&R, dated April 2, 2008, wherein he addressed each of the Plaintiff's allegations in turn.  First, with respect to the Plaintiff's claim that the ALJ did not obtain VE testimony as ordered on prior remand, the Magistrate Judge noted that the VE's testimony at the January 2007 hearing was "quite

15

confusing" but found that the VE clarified his testimony at the conclusion of the hearing by stating that although the DOT listed the jobs of carton packer and laundry worker as jobs requiring level two reasoning, in his experience, the job of carton packer and 30 percent of the laundry worker jobs require only level one reasoning, of which the Plaintiff was capable. Next, with respect to the Plaintiff's claim that the ALJ failed to properly evaluate and consider his mother's testimony, the Magistrate Judge noted that the ALJ recounted the Plaintiff's mother's testimony in his decision, and it appeared that the ALJ considered the Plaintiff's mother's testimony in making his findings, specifically with respect to the Plaintiff's social functioning and concentration. Lastly, with respect to the Plaintiff's claim that the ALJ failed to consider whether the Plaintiff's combined impairments were of equal medical significance to a listed impairment, the Magistrate Judge reviewed the record and determined that the ALJ properly considered the combined effect of the Plaintiff's impairments.

In the Plaintiff's written objections to the R&R, he first argues that both the ALJ and the Magistrate Judge failed to reconcile the VE's contradictory testimony. Second, the Plaintiff asserts that the Magistrate Judge erred in finding that the ALJ properly evaluated the Plaintiff's mother's testimony, as the ALJ had been instructed to do on the previous remand. Finally, the Plaintiff asserts that the Magistrate Judge incorrectly dismissed the ALJ's failure to do a proper combination of impairments analysis.

A.    **Contradictory Testimony**

At the January 2007 hearing, the ALJ set forth the following hypothetical for the VE to consider:

Assume I find the claimant is 27-years of age and has an 8th grade

16

education in special education and is illiterate by Social Security standards. Assume further for the moment that on an exertional level he could perform no greater then [sic] medium work activity and that he has the following non-exertional limitations. He's, he reads at the 4th grade level and is illiterate by our standards, he has a verbal IQ of 73, a performance IQ of 73 and a full scale IQ of 72. He's right-handed, he has a flexion contracture problem with his left ring finger and is moderately limited in his left hand grip. The grip strength in his left hand is three out of five. In addition he has a [sic] antisocial personality resulting in moderate limitations in understanding, remembering and carrying out detailed instructions and in maintaining concentration and . . . attention . . . for extended periods. He's limited to working at a relatively low-stress setting where he couldn't have to deal with the general public or relate extensively with others.

(Tr. at 513-14.) Upon consideration, the VE testified that such an individual could perform the jobs of laundry worker and carton packer, both of which require level 2 reasoning. Because the hypothetical limited the Plaintiff to level one reasoning, the Plaintiff's attorney asked for an explanation of level two reasoning. The VE responded: "the reasoning at 2 means, that they have to make some decisions. Now in the case of the carton packer, there's no decision to be made, they just watch the machine, it packs cigarettes, packs packs. . . there's really no heavy level of reasoning involved." (Tr. at 516.) The Plaintiff's attorney then asked the VE the following questions:

Q.    Are there – can you name any jobs with the limitations set out in this hypothetical that would be listed as an R1 in the DOT?

A.    Probably not in the DOT.

Q.    If you added to that hypothetical that the antisocial personality traits included suspicion, displays of anger and difficulty in, of course, he included that difficulty, that [he] not [have] contact with other people. But difficulty in getting along with other people including supervisors, would that [a]ffect his ability to do those jobs?

A.    If, if it included not getting along with supervisors it would eliminate the jobs.

Q.    Okay. And how about – what's the definition of a moderate limitation?

17

Because it's given as a moderate limitation in understanding, remembering and carry[ing] out detailed instructions. Is there a percentage, you know, it would be 20 percent –

A.    Yeah, more, more than 50 percent.

Q.    More than 50 percent. So a person who was unable to concentrate, remember and carry out instructions for more than 50 percent of the time could do this work?

A.    The carton packer they could do because there's no –

Q.    Wouldn't the person need at least to have to concentrate on the machine –

A.    Yes.

Q.    – and whether the machine was operating?

A.    Would have to concentrate on the machine.

Q.    And they could do that for only 50 percent of the time?

A.    Okay. If he cannot, if he cannot concentrate then I would eliminate it. Could not concentrate more than 50 percent, moderate limitation, I would eliminate the job.

Q.    Okay. Would that eliminate pretty much all jobs?

A.    Yeah.

(Tr. at 517-18.) Subsequently, the ALJ asked the VE the following questions:

Q.    So in my original hypothetical, I never limited him to R1 or R2.

A.    Right.

Q.    The DOT says this [the laundry worker job] is R2. With the limitations I gave could he do a job in a R2?

A.    In a what?

Q.    At the R2 reasoning level?

A.    He could not according to the DOT.

18

Q.    No.  Well, just – all right.  So he couldn't do the job as a laundry worker?

A.    As it's described in the DOT.

Q.    Okay.  So there's a conflict between your testimony –

A.    That's correct.

Q.    – and the DOT?  Now the jobs you gave, are they at the R2 level or what are they?

A.    They are both at R2 according to the DOT.  I'm, I'm basing my testimony on the observation in the factory.

Q.    Okay.  The 2,618 jobs, are they at R2?

A.    That's what the DOT claims, but the few places that I've observed where laundry workers are, they don't have to do – make any reasoning.

Q.    Okay.  But how many of those jobs are there?

A    According to the South Carolina's Department of Labor they're saying there's 2,618 at R2.

Q.    How many at R1?

A.    I'd cut it by 70 percent.

Q.    Okay.  The original limitations I gave you, based on your observations and expertise, you know, limiting the work in a relatively, to a relatively low stress setting.    Moderate limitations in understanding, remembering and carrying out detailed instructions and maintaining concentration, attention for extended periods, together with his IQ, et cetera.  Would those limitations limit him to R1 or R2 or R anything?

A.    It would limit him at R2.

Q.    So he could only do R1's?



A.    Which I've cut that number by 70 percent.

Q.    Okay.  Now I'll look up carton packer.

19

A.      That's just a machine tender, but I think it's listed as carton packer.

Q.      Okay. We have – all right, carton packaging – machine operator, which is the same DOT number you gave me. Okay, strength, light, that is also R2, and the number of jobs in South Carolina you gave me are 3,055. Would I cut that number by 70 percent or –

A.      I wouldn't cut them at all because the, the two factories that I observed there's no reasoning involved at all. It would be an R1, I don't know why the DOT has it as an, even at an R2.

(Tr. at 520-21.)

In the R&R, the Magistrate Judge recognized that the VE's testimony was quite confusing but concluded that the ALJ sufficiently reconciled the apparent discrepancies in the testimony. In his objections to the R&R, the Plaintiff asserts that the Magistrate Judge failed to consider the VE's definition of "moderate" as applied to the Plaintiff. After an extensive review of the record including the hearing transcript, the Court agrees.

Here, as the Plaintiff points out, the VE testified that a "moderate" limitation is one that is present more than 50% of the time. Here, the hypothetical presented to the VE included a claimant with "*moderate* limitations in understanding, remembering and carrying out detailed instructions and in maintaining concentration and . . . attention . . . for extended periods." When asked whether an individual with moderate limitations in concentration could perform the job of carton packer, the VE specifically testified that he would eliminate the job. Furthermore, when asked whether this "moderate" limitation would eliminate all jobs, the VE testified, "Yeah." (Tr. at 518.) Despite this testimony, the VE also testified that the Plaintiff could perform the jobs of laundry worker and carton packer. After a thorough review of the VE's testimony, the Court simply cannot reconcile the apparent inconsistencies contained therein. Stated simply, the problem lies not with the VE's

20

determination that the jobs of carton packer and 30 percent of the jobs of laundry worker require only an R-1 reasoning level, rather than the R-2 reasoning level as set forth in the DOT.[5]  Instead, the problem lies with the fact that the VE testified, on the one hand, that a claimant with the limitations set forth by the ALJ, including a moderate limitation in concentration, could perform the jobs of carton worker and laundry worker, and then on the other hand, the VE testified that he would eliminate all jobs for a claimant with a moderate limitation in concentration (defined as unable to concentrate more than 50 percent of the time).  Based on the apparent conflict in the VE's testimony, which renders it unreliable, the Court finds that the Commissioner failed to satisfy his burden of providing evidence of a significant number of jobs in the national economy that the claimant can perform.

**B.    The Plaintiff's Mother's Testimony**

The Plaintiff next objects to the Magistrate Judge's determination that the ALJ properly considered his mother's testimony, as previously ordered on remand.  A review of the ALJ's decision indicates that the ALJ did not explicitly state that he considered the Plaintiff's mother's testimony in finding the Plaintiff moderately limited in social functioning, and in maintaining concentration, persistence, and pace; however, the Court agrees with the Magistrate Judge that it is apparent that the ALJ did, in fact, consider this testimony.

First, in his decision, the ALJ recounted the Plaintiff's mother's testimony about the Plaintiff's mental impairments and ultimately found that the Plaintiff has an antisocial personality resulting in moderate limitations in understanding, remembering and carrying

---

[5] Indeed, the <u>DOT</u> is not the only resource that an ALJ can use when determining whether work exists in the national economy that a claimant can perform; the ALJ can rely on VE testimony as long as a reasonable explanation exists to explain any conflict between the VE's testimony and the DOT.  <u>See</u> 20 C.F.R. § 416.966(d)-(e) (2007); S.S.R. 00-4p.

out detailed instructions and in maintaining concentration and attention for extended periods. Additionally, the ALJ found that the Plaintiff was limited to working in a relatively low-stress environment where he would not have to deal with the general public or relate extensively with others. With respect to the Plaintiff's mother's testimony regarding the Plaintiff's back pain, the ALJ found such testimony to not be fully credible based on a review of the medical evidence, which showed no back abnormalities. Based on the foregoing, the Court finds that the ALJ properly considered the Plaintiff's mother's testimony; nevertheless, because the Court is remanding this matter for further proceedings based on the VE's contradictory testimony (as set forth above), in the interest of clarity and fairness, the Court urges the ALJ to more specifically explain his consideration of the Plaintiff's mother's testimony on remand.

### C.    Systematic Analysis

Lastly, the Plaintiff objects that the Magistrate Judge incorrectly dismissed the ALJ's failure to do a proper combination of impairments analysis. The Court disagrees with the Plaintiff and finds no error in the Magistrate Judge's determination that the ALJ properly considered the combined effects of the Plaintiff's impairments. As previously set forth, the ALJ limited the Plaintiff to medium work to account for his low-back pain. Additionally, the ALJ found that the Plaintiff's "flexion contracture problem" with his left ring finger reduced his grip strength in his left hand. To accommodate for the Plaintiff's borderline intelligence and antisocial personality traits, the ALJ limited the Plaintiff to low-stress work that a person with "moderate limitations in understanding, remembering, and carrying out detailed instructions and in maintaining concentration and attention for extended periods" could handle. Moreover, this work did not require contact with the general public or extensive

22

contact with others.  After a review of the record, the Court finds that the ALJ properly considered the combined effects of the Plaintiff's impairments.

## CONCLUSION

Based on the foregoing, the Court adopts the R&R only to the extent that it is consistent with this Order.  Because the Court finds that the ALJ erred in his reliance on the VE's contradictory testimony, the Court remands the matter to the Commissioner for further proceedings.  Upon remand, the Commissioner is specifically directed to obtain testimony to explain the apparent conflict in the VE's testimony regarding the Plaintiff's ability to perform work.  Therefore, it is

**ORDERED** that the Commissioner's denial of benefits is reversed under sentence four of 42 U.S.C. § 405(g) and 1383(c)(3), and the matter is remanded to the Commissioner for further consideration consistent with this Order.

**IT IS SO ORDERED.**

The Honorable Sol Blatt, Jr.
Senior United States District Judge

July **24**, 2008
Charleston, South Carolina

## ADDENDUM

Should this remand result in the award of benefits, plaintiff's attorney is hereby granted, pursuant to Rule 54(d)(2)(B), an extension of time in which to file a petition for authorization of attorney's fees under 42 U.S.C. § 406(b), until thirty (30) days subsequent to the receipt of a notice of award of benefits from the Social Security Administration. *This Order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act.*[6]

---

[6] This language was taken from Stutts v. Astrue, 489 F. Supp. 2d 1291, 1295 (N.D. Ala. 2007).

23